UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
DILCIA ESCOTO,

                        Plaintiff,

        - against -                                          **MEMORANDUM OF**
                                                             **DECISION AND ORDER**
UNITED STATES OF AMERICA,                                    CV 10-2223 (ADS)(ETB)

                        Defendant.
----------------------------------------------------------x

**A P P E A R A N C E S:**

        **CANNON & ACOSTA, LLP**
        Attorneys for the Plaintiff
        1923 New York Avenue
        Huntington, New York  11746
        By:     Gary Small, Esq.,
                of Counsel

        **LORETTA E. LYNCH**
        United States Attorney for the
        Attorney for the Defendant
        Eastern District of New York
        610 Federal Plaza, 5th Floor
        Central Islip, NY  11722
        By:     Diane Leonardo Beckmann, Esq.,
                Assistant U.S. Attorney,
                of Counsel

**SPATT, District Judge.**

        This is an action to recover damages for personal injuries sustained by the plaintiff Dilcia

Escoto (the "plaintiff" or "Escoto") in a motor vehicle collision with a mail delivery truck.  The

action is brought pursuant to the Federal Tort Claims Act ("FTCA") against the defendant the

United States of America (the "defendant"), the owner of the mail delivery truck, which was

operated by its employee, letter carrier Bonnie L. Gross.  A two day bench trial was held on

1

December 28 and 29, 2011.  The accident occurred on November 25, 2009, at approximately 10:00 am, at or near the intersection of three streets, Wilson Boulevard, Smith Street and Brier Street.  The location of the accident is important because it did not occur at the usual two street crossed intersection.  There is a diagram in evidence, Dft's Ex. H-8, which shows that Wilson Boulevard is a generally north-south street.  Wilson Boulevard is intersected by two other streets, Smith Street on the south and Brier Street on the north.  The two side streets intersect Wilson Boulevard and are a short distance apart as they intersect with Wilson Boulevard – (see the diagram annexed as Exhibit A).  Shortly before the accident, the plaintiff was proceeding in a westerly direction on Smith Street approaching Wilson Boulevard.  Also, shortly prior to the accident, the mail truck was being operated by Bonnie Gross in an approximate southerly direction on Wilson Boulevard approaching Brier Street.

The issues in this non-jury trial are:  (1) the liability, if any, of the defendant United States of America for the actions of the driver of the mail truck; (2) the liability, if any, of the plaintiff on the issue of comparative negligence; and (3) damages, if there be a recovery.  Also involved in this case – and it is a major issue – is whether the plaintiff sustained a "serious injury" within the provisions of the relevant no-fault law.

For the reasons set forth below, the Court finds that the negligence of the defendant, the United States by its driver Bonnie L. Gross was the sole cause of the accident.  However, the Court also finds that the plaintiff did not sustain a "serious injury"within the provisions of the applicable No Fault Law.  The Court will review all of these findings in order to establish a record for all purposes.

# I.  The Trial

## A.  The Plaintiff's Case

The plaintiff Dilcia Escoto testified with the aid of an interpreter.  In places, the Court found her testimony to be somewhat unclear, which had to be remedied.  She was involved in other motor vehicle accidents in 2004 and 2006.  She was a passenger in one of these occurrences.  In those prior accidents, the plaintiff sustained injuries to her neck and back and to her left knee and left ankle.  As to these prior accidents, the plaintiff  testified that she did not suffer any injury to her right knee, which is the injury involved in this case.

On November 25, 2009, a weekday, at approximately 9:30 to 10:00 am, the plaintiff was coming from her son's school after dropping him off.  She was familiar with the area – she knew these roads and had driven there before.  The weather was clear and dry.  In her car was her baby in the back of her vehicle.  At some point she entered Smith Street in Central Islip, a residential area.  The plaintiff drove in a westerly direction on Smith Street to the intersection of Smith Street and Wilson Boulevard.  There was a stop sign at that intersection for her vehicle on Smith Street.  The intersection of  Wilson Boulevard and Brier Street is slightly north of the intersection of Wilson Boulevard and Smith Street.  It is not a typical "T" intersection in that the two intersecting streets onto Wilson Boulevard are a short distance apart.  The plaintiff brought her vehicle to a full stop on Smith Street at its intersection with Wilson Boulevard.  She was stopped at that intersection for approximately five seconds.  At that time she saw the postal truck on her right side.  The postal truck was proceeding south on Wilson Boulevard.  The postal truck also had a stop sign at the intersection of Wilson Boulevard and Brier Street.  So that both drivers approached the irregular intersection with stop signs facing them.

3

The plaintiff intended to go from Smith Street to Brier Street, which required that she turn right onto Wilson Boulevard and then make an immediate left turn onto Brier Street.  She never made the left hand turn onto Brier Street because of the accident.

After making a full stop on Smith Street for about five seconds, the plaintiff made a right turn to enter Wilson Boulevard.  It was her intention to go onto Wilson Boulevard only for a very short distance and then make a left turn onto Brier Street.  The accident occurred after the plaintiff made a right turn onto Wilson Boulevard.  She was then going straight on Wilson Boulevard and had not reached Brier Street when the accident occurred.  Gross later testified that the accident occurred after the postal truck was past or south of  Brier Street.  The plaintiff testified that she saw the postal truck driver "reading some letters" as her vehicle was at the stop sign heading south on Wilson Boulevard.  As stated previously, the plaintiff's testimony, by way of an interpreter was not always clear and understandable, which required some remedial efforts.  However, the following is the key portion of her testimony as to the happening of the accident.

Q.	Now, the post office truck, did you see that vehicle before the accident over near the stop sign?

A.	Yes.

She was like a car length behind the stop sign and she was reading some letters.

THE COURT:  She was what?

THE INTERPRETER: Reading some letters.

BY MR. SMALL:

Q.	When you say she, you're talking about the driver of the postal service vehicle?

A.	Correct.

4

*     *     *     *     *

BY MR. SMALL:

Q.      When you were - - I'll back up a second.

        Let's go back to the stop sign where you were stopped.

        Did there come a time you made a right-hand turn?

A.      Okay.

Q.      Can you tell us what happened after that please?

A.      Okay.  Like I said, I was stopped.  I had this car on my left side.  He had the stop sign.  He stopped the car.  Then he proceeded to cross over.

        After that, I saw to my right and there was a truck from the postal service and it was like a car length behind the stop sign and she was reading some letters.

        So after I stopped for five seconds, I then went ahead and made a right turn

as I was going then suddenly she just went out and didn't stop at the stop sign.

Q.      Did a collision occur at that time?

A.      Correct.

Q.      To what part of both vehicles?

A.      She hit me in front of my vehicle.

Q.      What part of the postal service truck was involved in the accident, if you know?

A.      The left side.

        THE COURT:          The left side did you say?

        THE INTERPRETER:          Yes.

(Tr. at 74, 75).*

_____

*  Tr. refers to the trial transcript.

5

The plaintiff's car was a white BMW.  The collision caused little damage to the front of the vehicle.  A photograph of the Escoto vehicle is annexed to this decision as Exhibit B.  Asked to describe what happened to her as a result of the impact, the plaintiff testified that she hit her neck, lower back and right knee.  Her right knee struck the side of the car.

Police and postal services personnel arrived at the scene.  Escoto does not speak English and could not communicate with the police.  Escoto called her sister who came to the scene, picked her up and the baby and took the baby home.  Her sister then drove Escoto to Southside Hospital.  At the hospital she complained of pain in the neck, back and right knee.  Following the visit to the hospital, the plaintiff was treated by two chiropractors, Drs. Simmetti and Martin.  Escoto had "a lot of pain" in the right knee.  In addition, there was a "clicking" in the right knee and every time she walked, the right knee buckled.  The chiropractor referred her to Dr. Christopher Durant, an orthopedic surgeon.

Dr. Durant referred the plaintiff for an MRI prior to surgery on her right knee which "hurt her a lot."  Thereafter, Dr. Durant performed surgery on the plaintiff's right knee at North Shore Long Island Jewish Hospital.  After the surgery she was treated by Dr. Durant on only one occasion.  She was also treated for her back and neck by Dr. Martin, the chiropractor for seven to eight months.  In October 2010 she started work for an electronic manufacturer.  She was provided with a job in which she could sit.  However, that sitting job did not last long and she was laid off in May 2011.  The plaintiff has not worked since that time.  Escoto was asked about her present complaints.  She responded in the following manner:

Q.    Following the accident of November 2009, can you tell us all the limitations that you had in your daily activities because of your knee injury?

A.    Can I play with my baby, run with him, I can't because my knee hurts me a lot.  I

6

can not wear high heels.  I cannot, like I said, play with the other children like
when they ask me to go to the park because I cannot be too long walking,
standing.  And I cannot go to the gym because all the exercises involved with foot
and legs, running and things like that.

Q.     Are you able to have a job where you stand up and lift heavy items?

A.     No.

(Tr. at 91.)

On cross-examination, the plaintiff again described her route prior to the accident.  She
was proceeding from Smith Street to Brier Street.  In order to do that she had to stop at the stop
sign on Wilson Boulevard and then make a right turn onto Wilson Boulevard and then a left on
Brier Street.  The accident occurred on Wilson Boulevard before she reached Brier Street.  At the
time of the accident, both the plaintiff and the postal truck were going straight on Wilson
Boulevard in opposite directions.  The plaintiff testified that the postal truck had no damage even
though it was hit on the left side.  The plaintiff declined an ambulance offered by the police at
the scene.  She last saw Dr. Durant in January 2010 and chiropractors, Drs. Martin and Simoneth
in or about April 2010.  She is able to drive a car and to walk.

In the plaintiff's case, her counsel read a portion of the testimony of  Bonnie Gross, the
postal service letter carrier who was driving the postal truck involved in the accident.  This short
portion follows:

Q.     Were there any vehicles parked on Wilson Boulevard in the direction you were
       headed, southbound?

A.     I don't remember, to be honest with you.

Q.     At any time before the accident did you see the vehicle which struck the postal
       truck?

A.     No.

7

Q.      Do you know which direction the vehicle was coming from?  Was it on Wilson or somewhere else?

A.      She was on Smith Street.

Q.      Is that something you learned later?

A.      No.

Q.      How did you know the vehicle was on Smith Street?

A.      'Cause I know the intersection.  I deliver on Brier, but later in the day.

Q.      I understand.

        After you stopped at the stop sign and the proceeded about one or two car lengths before the impact, do you know if the vehicle was on Wilson Boulevard before the accident?

A.      No.

Q.      Do you know if it was on Smith Street?

A.      No.

Q.      Which portion of the postal truck was involved in the accident?

A.      The front and upper wheel well.

Q.      Front, directly in the front, more toward the driver side which in your case would be on the right side of the truck or to the left side or something else?

A.      It would have been the left side.

Page 15, line 14:

Q.      Since you didn't see the other vehicle, I'm going to assume you can't estimate the speed of the other vehicle; is that fair?

A.      No.

(Tr. at 136, 137 and 138).

        Dr. Christopher Durant testified that he is a board certified orthopedic surgeon.  He has

8

his practice in Amityville, Long Island and treats patients for trauma related conditions.  The

plaintiff became his patient on December 7, 2009, referred by her chiropractor.  She provided a

history of being involved in a motor vehicle accident on November 25, 2009 and having injured

her right knee, cervical spine, limbo-sacral spine and her left scapula area.  Dr. Durant obtained a

past history from the plaintiff including her two prior accidents.  Her chief complaints were pain

in her right lower extremity and her cervical spine.  Upon examination, he found that the

extension and flexion of her right knee was diminished.

Dr. Durant next examined the plaintiff on January 11, 2010.  She was not working and

was getting physical therapy.  She complained of pain in the cervical spine radiating into her left

shoulder; and lower back pain which was also radiating.  The pain in the right knee was

"associated with a snapping sensation when flexing or extending the right knee."  When the

plaintiff extended or moved her right knee "you could hear loud sound or noise or popping in the

knee."  (Tr. at 14).  This indicated an injury to the patella in the knee in the nature of a "chondral

flap tear," which would cause pain and limitation of motion.  At this visit, Dr. Durant discussed

surgery of the right knee because of the pain and snapping sensation in the right knee.  Dr.

Durant felt that surgery was necessary because, despite the conservative treatment with physical

therapy, she still remained symptomatic.  Also, an MRI report indicated it could be an associated

patella instability and/or chondromalacia of the patella, meaning there may be some damage to

the cartilage in the surface of the patella, that could cause pain and limitation of flexion.

The surgery was performed at Syosset Hospital on January 21, 2010.  Prior to surgery,

the diagnosis was internal derangement of the right knee.  This was a diagnostic arthroscopic

surgery, "meaning you go inside with a small instrument into the knee space to determine if there

are any injuries."  In this surgery, Dr. Durant found some softening of the cartilage in the patella.

He also found some fissures along the surface of the patella, a small minuscule tear and a

traumatic chondral flap tear in the medial femoral condyle.  It was a grade two defect, meaning

that this cartilage was still intact "but kind of soft because of the injury."  (Tr. at 22).  Asked to

explain in further detail, Dr. Durant states, "its kind of a groove in the cartilage meaning some

kind of damage could have occurred to the cartilage surface."  (Tr. at 22).  The cartilage covers

the bone.  He also found small tears of the lateral meniscus which indicated, "some form of

trauma or wear and tear in the meniscus,"  (Tr. at 23), which is the cushion between the bones

and provides some stability to the knee.

In addition, Dr. Durant found a symptomatic medial plica, which is a band located along

the medial side of the knee.  He also made a diagnosis of a medial femoral condyle chondral

defect grade three; which is a tear of the medial femoral condyle, almost but not completely

exposing the bone.  During the surgery, Dr. Durant removed the plica; and shaved or removed

the cartilage flap on the medial femoral condyle.  He removed the piece of cartilage flap,

"because the flap could also be a reason why she could be having the snapping and pain or the

snapping sound to the knee as well."  (Tr. at 29).  Dr. Durant also shaved the small meniscus tear

and the chondral fissures, to make the structures even.  During the operation as an additional

procedure, Dr. Durant also excised the medial plica "for the purpose of avoiding the rubbing of

the plica against the femoral chondral, which sometimes can cause pain."  (Tr. at 30).  In

addition, post operatively, Dr. Durant injected marcaine, to relieve the pain from the surgery,

following the procedure.

The operation was performed under general anesthesia, followed by the marcaine local

10

anesthetic into the knee.  Following the surgery, Dr. Durant saw the plaintiff on only one

occasion, on January 25, 2010.  At that time the surgical incisions were clean and dry and there

was no post-surgical infection.  Her right knee extension was zero degrees because of the surgery

and flexion was 90 degrees.   At that time he referred the plaintiff for physical therapy.  This

testimony concluded the direct examination of Dr. Durant.  The Court notes that the doctor was

not questioned as to permanency and he rendered no opinion on that subject.  Nor was he asked

some of the usual questions as to whether the motor vehicle accident was the competent

producing cause of the conditions in the plaintiff's right knee.

On cross-examination, Dr. Durant again testified that the surgery he performed on

January 21, 2010 was "diagnostic surgery," (Tr. at 35), which lasted about 45 minutes and

involved using a scope.  He also stated that on the January 11, 2010 visit, prior to surgery, the

flexion in her right knee was 130 degrees, which is full flexion.  Also in the hospital prior to her

surgery, as to past assessment, the entry was zero pain, and zero limitation, namely extension

and flexion were normal.  The intake nurse circled the words "no pain" with a little smiley face.

Also the notation indicated that prior to her surgery, the plaintiff was "independent in her

activities."  After the surgery, her diagnosis was a right knee internal derangement, which is a

group of disorders that can affect the knee.  She also sustained a cervical sprain or strain and a

limboscacral sprain or strain and a tear of the lateral cartilage or meniscus of the knee.

According to Dr. Durant, some of these conditions can be congenital or caused by running or

physical activity or by somebody who works on their feet a lot.  In this regard, strangely, Dr.

Durant conceded that he did not know what Escoto did for a living.

Dr. Durant also treated the plaintiff prior to this accident on May 2004.  At that time she

11

complained of left knee pain, headaches and constant cervical spine pain.  He does not recall if he performed surgery on the plaintiff's left knee.  His diagnosis in May 2004 cervical spine sprain, lumbo sacral spine strain, left hip contusion, left hip bursters and a left knee internal derangement and tendonitis.  Two of the 2004 injuries were similar to those sustained in this accident namely the cervical stain and the limboscacral strain.  However, apparently, there was no injury to the right knee in those occurrences.

Dr. Durant testified that his medical bills were paid through no-fault insurance.  The plaintiff's visit on January 25, 2010 was the last time he examined the plaintiff.  So that, at the present time, he has "no indication of what her current condition is."  (Tr. at 56).

The Court reserved decision on the defendant's Rule 50 motion at the end of the plaintiff's case.

**B.  <u>The Defendant's Case</u>**

Bonnie L. Gross testified that for 22 ½ years she has been a regular letter carrier for the United States Postal Service.  Each working day she gets her mail together, loads her truck and delivers the mail.  She drives a Ford truck and sits as the driver on the right hand side of the truck.  On November 25, 2009, she sorted all her mail, loaded her truck and eventually made a right turn onto Wilson Boulevard.  She was going to drive on Wilson Boulevard for at least two miles to Spier Drive.  She is familiar with the intersection of Wilson Boulevard in the vicinity of Brier Street, having taken that route for five years.

Gross described how the accident occurred.  She came to a stop for a stop sign on Wilson Boulevard at Brier Street and then she testified as to what occurred at that time:

Q.     Did there come a time on November 25th of 2009 that you came to a stop sign at Wilson Boulevard and Brier Street?

A.     Yes.

Q.      Did you stop at that stop sign?

A.      Yes.

Q.      What is anything happened next?

A.      I heard a crash as I was going along.

Q.      And what did - - did you subsequently learn what the crash was?

A.      Yes, when I looked and saw another car.

        But I - -

Q.      You saw another car that had hit into you?

A.      After - - after the accident.

Q.      When you stopped at the stop sign at Wilson Boulevard and Brier Street, did you come to a complete stop?

A.      Yes.

Q.      And did you look to see if there were any cars at the intersection of Smith Street and Wilson Boulevard?

A.      I did not see any.

Q.      And did you look to see any?

A.      I was looking straight ahead.

Q.      And did you look at the stop sign at Wilson and Smith to see if there were any cars?

A.      Yes.

Q.      And you did not see any cars?

A.      Yes.

(Tr. at 192, 193).

13

Of importance, Gross testified that when she made a full stop at the intersection of Wilson Boulevard and Brier Street, facing south, squarely in the direction of the plaintiff's vehicle, which must have been in the area, she did not see the plaintiff's car.  She then heard a crash and looked again and saw "another car."  Her vehicle's speed at the time of the impact was five miles per hour, if that.  She then moved her car onto Smith Street and parked.  Gross then went over to Escoto, the driver of the other vehicle and asked her how she was.  The plaintiff did not respond.  An ambulance was called to the scene, but no one entered the ambulance.

The mail truck sustained slight damage over the left side wheel well and bumper.  The photograph of the mail truck after the accident is annexed as Exhibit C.  The minor damage to both vehicles is an indication that the impact was slight.  Although Gross testified that her vehicle was going north on Wilson Boulevard, in actuality she was headed south at the time of the accident.  According to Gross, the point of impact was on Wilson Boulevard just past the intersection with Brier Street.

On cross-examination, Gross was again questioned about what she saw or did not see just prior to the accident.

BY MR. SMALL:

Q.      Ma'am, did you check for any traffic in the intersection when you proceeded?

A.      I stopped at the stop sign and I went straight ahead.

Q.      Okay.

          Ma'am, my question is, did you check for any traffic as you proceeded into

          the intersection?

          Yes or no?

14

A.     I don't remember.

Q.     Okay.

        THE COURT:     I'm sorry.

                        I didn't hear your answer.

        THE WITNESS:     I said I didn't remember.

BY MR. SMALL:

Q.     And, ma'am, you actually never saw my client on Wilson Boulevard, correct?

A.     No.

Q.     You don't know how the accident happened, correct, ma'am?

A.     No.

Q.     You didn't even see the impact, right?

A.     I heard it.

Q.     Right.

        I understand you heard it, and you probably felt it, right?

A.     Yes.

Q.     But you didn't see it, right?

A.     No.

Q.     And you don't know where my client was in the road even, do you?

A.     No.

Q.     Actually, ma'am, where were you looking as you proceeded - -

A.     I was looking straight ahead, sir.

Q.     Let me just finish the question, if I might.

Where were you looking as you proceeded and had your accident?

A.      Straight ahead.

Q.      And what did you see at the moment of the impact?

A.      I saw the car.

Q.      You did see the car at the moment of the impact, or you saw the car after?

A.      I saw the car after.

(Tr. at 205, 206, 207).

Gross did not see the other vehicle prior to the impact, so that she could not estimate the speed of that vehicle prior to the accident.  Gross estimates that she had traveled about two car lengths when the accident occurred.

Police Officer Daniel Fandrey testified that he was familiar with the area of Wilson Boulevard, Smith Street and Brier Street in Central Islip and patrols the area almost daily.  "It's a four way intersection, Wilson Boulevard is a north-south road; Brier is an east-west road and Smith Street is also an east-west roadway."  (Tr. at 223).  At each one of the intersection there is a four way stop sign.

On November 25, 2009, he responded to the location of the accident at the location of Wilson Boulevard and Brier Street.  It was a car accident involving two vehicles, a mail delivery truck and a white BMW.  The BMW was in the middle of the intersection on Wilson Boulevard facing northwest and Brier Street, blocking traffic, and the mail truck was parked on Smith Street.  Officer Fandrey spoke to both drivers.  He asked the plaintiff if "everybody was okay."  He was concerned about the child in the back seat.  Escoto responded that "she was okay, and the child was okay too."  (Tr. at 230).  He asked Escoto if she was able to move her vehicle

16

because it was blocking traffic.  She did not move the vehicle; he had to do so.  When he asked

Escoto for her driver's license, she did not have a driver's license.  At the scene he checked with

the New York State Department of Motor Vehicles and apparently, Escoto did not have a valid

New York State driver's license at the time of the accident.  He gave Escoto a ticket for an

unlicensed operation of a motor vehicle.  During this time, Escoto did not indicate to him that

she did not understand what he was saying to her.

Officer Fandrey asked Escoto to get out of her car and to remove the child from the back

of the car.  He observed Escoto remove the child from the rear of the car.  She did not appear to

have any difficulty in removing the child.  He asked Escoto if she needed an ambulance and she

responded that she did not.  Officer Fandrey testified that he did not observe any injuries on

Escoto.  In his police accident report he stated that "no one reports any injuries in the accident."

(Tr. at 233, 234).  He saw damage to the middle of the BMW front bumper.  He also saw damage

to mail truck left side near the front tire.

On cross-examination, Officer Fandrey testified that the accident occurred at

approximately 10:20 am, and he arrived shortly thereafter.  He questioned the postal truck driver

as to how the accident occurred and "she said she was going south on Wilson Boulevard when

she was struck by another vehicle."  (Tr. at 241).  In his notes he described the accident as

follows: "V2 struck V1 at above 1L.  V2 failed to yield to V1 who was in the intersection."  (Tr.

at 242).  There was no witnesses to the accident.  By his testimony, the Court senses that Officer

Fandrey did not recall too many facts about this accident and he took no measurements.  He

found debris from the accident on Wilson Boulevard "just south of Brier Street."  (Tr. at 258).

Dr. Jerrold Gorski is a board certified orthopedic surgeon.  He examined the plaintiff on

behalf of the defendant on April 25, 2011, fifteen months after her operation.  At that time the

plaintiff had complaints in the front of her right knee and the lower back, and she related this to a motor vehicle accident on November 25, 2009.  He obtained a history from the plaintiff.  She was seen in the emergency room of a hospital where she was treated and released.  Thereafter the plaintiff was treated by a chiropractor, Dr. Martin for some eight months.  She then came under the care of an orthopedist, Dr. Durant, who operated on her right knee shortly thereafter.  The plaintiff told him that she was a little better after surgery, and she continued with physical therapy until the middle of 2010.

Dr. Gorski also obtained a prior history of two other motor vehicle accidents.  One was in 2004 and she had to undergo left knee surgery at that time.  The second motor vehicle accident occurred in 2006 with injuries that involved shoulder surgeries on both sides.  Of interest, in a medical report dated September 7, 2006, the plaintiff had bilateral knee pain and the impression then was internal derangement of both the right and left knees.

The plaintiff advised Dr. Gorski that she was unemployed at the time of the accident but was working full time for six months prior to his visit doing full duty as an assembler in an electronics company.  At the time of his examination, the plaintiff was not taking any pain pills or anti-inflammatory pills.  Dr. Gorski noted that she was not receiving any medical treatment at the time of his examination.  As to his examination and findings, Dr. Gorski testified that the plaintiff did not have any distress; she was able to walk around without distress; she could do a full deep knee bend and arise without hesitation and complaint; she had a normal gait; and his tests for the neck and back were all normal.

With respect to the plaintiff's knees, there was no swelling, no warmth, and no tenderness.  She did have an increased Q angle, which is a congenital abnormality.  The range of motion in the plaintiff's knees was also normal.  So that, other than the congenital finding, her

18

knees were entirely normal.  He also stated that the plaintiff was able to do a full deep knee bend which indicated full mobility in the knee.

Dr. Gorski also reviewed the plaintiff's medical records.  He commented that in the emergency room, "they looked at the left shoulder and really nothing else."  (Tr. at 151).  Her complaints in the emergency room were limited to her left shoulder and there was no reference to her right knee.  Nor were any x-rays taken of her right knee.  As to Dr. Durant's report, it was noted that "he found at that early time interval full mobility in the knee, but there was some tenderness at the joint line on the inside and the outside."  (Tr. at 151).

Dr. Gorski also reviewed an MRI taken after the accident in December 2009, as follows:

Q.    What did the MRI from December '09 show?

A.    That the meniscus cartilage were normal, the ligaments were normal and there were no evidence of any significant joint effusion, which means water on the knee which is a significant report because had this been a serious injury involving the right knee, one would have expected at the very least some description of swelling within the knee.  And that was absent.

Also, Dr. Gorski found it significant that someone with these alleged defects in the knee joint after trauma would typically have a lot of swelling.  In this case, "there was no swelling identified on the MRI taken something like 10, 12 days post-op."  (Tr. at 160).  His full answers as to the condition of the plaintiff's right knee, as revealed by the surgery, is as follows:

Q.    Did you also review Dr. Durant's office visit notes of the plaintiff?

A.    Yes, I have.

Q.    And what, if anything, did you learn from those notes?

A.    The crux of the issue here is that somebody who has chondral defects and presumably meniscal tears, they're going to have significant complaints in the knee after that trauma.  They're going to typically have a lot of swelling.  In this case there was no swelling identified on the MRI taken something like 10, 12 days post-op.  They're going to be in distress, and most likely in the emergency room or shortly thereafter they're going to be treated almost immediately with

19

knee immobilizer, with crutches, they're going to have a lot of dysfunction, they're going to have a lot of pain.  They won't have full range of motion as Dr. Durant has described on his first postoperative visit.  And they're going to have significant problems if this happened correlated with the trauma.

   In the absence of those findings from Dr. Durant, the absence of findings or complaints in the emergency room, I think a logical conclusion is that the findings described in the surgery which is performed shortly after the incident, I think some six weeks after the injury, there's no other way to conclude but to say these are preexisting problems.

Q.  Doctor, I also wanted to refer you to I think you mentioned this a little bit, but Plaintiff's Exhibit 2, which is a report of orthopedic surgery from Dr. Durant dated January 11, 2010.  (Handing).

   Within that examination on January 11, 2010, the examination revealed that there is full flexion in the right knee; is that correct?

A.  His right knee examination indicates she has full extension, she has full flexion, there's a - - there's tenderness in the medial aspect of the right knee.

   All together, my opinion is this is out of context with the serious type of injury.

Q.  And this report is dated 10 days prior to the actual surgery?

A.  And approximately two and a half weeks after, or six weeks after the injury itself.

Q.  And Doctor, if the plaintiff, when she reported for surgery on January 21, 2010 reported that she had no pain and she had no limitations, what, if anything, would that indicate to you?

A.  My opinion is she may have had a temporary contusion or sprain of the knee at the most, and just with the natural passage of time this would have settled down and become asymptomatic.  And if it became asymptomatic, I can't indicate this knee for surgery.

(Tr. at 160, 161 and 162).

  In sum, Dr. Gorski testified that he did not think this was a serious injury involving her right knee and the findings in her right knee "was the result of something she was born with." (Tr. at 163).  His opinion and findings, or perhaps, better said, the lack of findings and the fact that she is not taking any medication or under active medical care is significant and in the

Court's view tends to confirm his findings.  His final conclusions were, "I don't think this was a serious injury to the knee and it was most likely just a bruise and she recovered naturally."  (Tr. at 164).

On cross-examination, Dr. Gorski later said, "she may have had bruises and sprains." (Tr. at 167).  Also he conceded that small tears in the lateral meniscus could well have been induced by trauma.  Also, at the time of his examination, the plaintiff did make complaints of pain on the right knee.  Finally, in his testimony, Dr. Gorski stated that he did not think this was a serious blow to the right knee.  In that regard, he testified as follows:

Q.    Just a few additional questions.  Doctor, are you saying that trauma to patient's right knee could not have been caused by the November 2009 accident or that you believe or something more limited than that?

A.    I'm not sure I understand the question.  I don't think this was a serious blow to that right knee.

Q.    How do you know that, sir?

A.    The clinical picture and what's missing here.  She doesn't have swelling, she doesn't have dysfunction, she doesn't have severe pain.  There's lacking a knee immobilizer, crutches, limitation of movement in the knee.  That's what you would ordinarily expect from an injury like this.

(Tr. at 181).

## II.  Discussion

### A.  Liability on the Part of the Defendant

The plaintiff is proceeding in this law suit pursuant to the provisions of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 and 2671.  Under the FTCA the plaintiff may recover "for . . . personal injury . . . caused by the negligent . . . act or omission of an employee of the Government while acting under the scope of his (or her) office or employment, under

circumstances which the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). In this case, the motor vehicle accident occurred in New York. Therefore, New York law applies. See Malzof v. United States, 502 U.S. 301, 305, 112 S.Ct. 711, 714, 116 L.Ed.2d 731 (1992).

The Court finds that the plaintiff established that at the time of the accident Bonnie Gross was negligent in the operation of the United States Postal vehicle. Further the Court also finds that the negligence of the postal truck operator was a proximate cause of this motor vehicle collision. In her deposition, the mail truck operator conceded that she did not see the plaintiff's vehicle at any time before the accident, nor does she recall that she even checked for traffic as she proceeded into the intersection.

> Q.   At any time before this accident did you see the vehicle which struck the postal truck?
>
> A.   No.

(Tr. at 136).

Also, in her own direct testimony, Gross again confirmed that she did not see the Escoto vehicle prior to the accident.

> Q.   And did you look to see if there were any cars at the intersection of Smith Street and Wilson Boulevard?
>
> A.   I did not see any.
>
> *   *   *   *   *
>
> Q.   And did you look at the stop sign at Wilson and Smith to see if there were any cars?
>
> A.   Yes.

22

Q.      And you did not see any cars?

A.      Yes.

(Tr. at 192, 193).

And again on cross-examination, Gross testified, as follows:

Q.      Okay.

        Ma'am, my question is, did you check for any traffic as you proceeded into

        the intersection?

        Yes or no?

A.      I don't remember.

                                        *    *    *    *    *

Q.      And, ma'am, you actually never saw my client on Wilson Boulevard, correct?

A.      No.

Q.      You don't know how the accident happened, correct, ma'am?

A.      No.

Q.      You didn't even see the impact, right?

A.      I heard it.

Q.      Right.

        I understand you heard it, and you probably felt it, right?

A.      Yes.

Q.      But you didn't see it, right?

A.      No.

Q.      And you don't know where my client was in the road even, do you?

23

A.    No.

                        *    *    *    *    *

Q.    You did see the car at the moment of the impact, or you saw the car after?

A.    I saw the car after.

(Tr. at 205, 206, 207).

It is a basic rule, that a motor vehicle driver should see, by the proper use of her senses, what was within her vision.  As stated in Bolta v. Kerri L. Lohan, 242 A.D.2d  356, 661 N.Y.S.2d 286, 287 (2d Dep't 1997):

> Indeed, under such circumstances it is settled that a driver is negligent where an accident occurs because she has failed to see that which through proper use of her senses she should have seen . . . . .  Since the plaintiff's car was clearly present, and was visible, the defendant Kerr L. Lohan should have seen it and yielded the right of way.  Her failure to do so established her negligence as a matter of law.

Id. (citation omitted) see also, Sulaiman v. Thomas, 54 A.D.3d 751, 752, 863 N.Y.S.2d 723, 724 (2d Dep't 2008) (summary judgment rendered in favor of the plaintiff where the defendant driver "did not see the injured plaintiff prior to striking him."); Benedikt v. Certified Lumber Corp., 60 A.D.3d 798, 875 N.Y.S.2d 526, 527 (2d Dep't 2009) (summary judgment in favor of the plaintiff when the MV-104 report of the defendant driver contained an admission that he did not see the plaintiff before he struck her); Hammond v. Diaz, 82 A.D.3d 839, 918 N.Y.S.2d 550 (2d Dep't 2011) (a 100% liability verdict in favor of the plaintiff was affirmed when the proof established that the defendant driver failed to see what he should have seen through the proper use of his senses); Laino v. Lucchese, 35 A.D.2d 672, 827 N.Y.S.2d 249, 250 (2d Dep't 2006) ("a driver is required to see what is there to be seen"); Levy v. Town Bus Corp., 293 A.D.2d 452, 739 N.Y.S.2d 459, 460 (2d Dep't 2002) ("a driver is required 'to see what, by

the proper use of his or her senses, he or she might have seen'"). <u>Rockman v. Brosnan</u>, 280

A.D.2d 591, 720 N.Y.S.2d 538 (2d Dep't 2001) (a jury verdict in favor of a defendant was

reversed when the driver did not see the plaintiff's car when he proceeded into the intersection);

<u>Zambrano v. Seok</u>, 277 A.D.2d  312, 715 N.Y.S.2d 750, 751 (2d Dep't 2000) (summary

judgment rendered against a plaintiff who did not see the defendant's vehicle before the

accident.  "Under these circumstances, Zambrano was clearly negligent in failing to see that

which he should have seen by the proper use of his senses").

Accordingly, the Court finds that the driver of the defendant's postal truck was negligent,

which was the proximate cause of the collision and the plaintiff's injuries.

Further, the Court also finds that there was no contributory negligence on the part of the

plaintiff.  The sole cause of this accident was the negligence of  Bonnie Gross.

**B.  <u>As to a "Serious Injury" Under the No-Fault Law</u>**

Pursuant to the provisions of the New York Insurance Law § 5104, a plaintiff cannot

recover for personal injuries arising from an automobile accident unless the plaintiff proves she

suffered a "serious injury" in the occurrence.  A "serious injury" is defined in New York

Insurance Law § 5102(d).  <u>Tenzer v. Hirshfeld</u>, 2011 U.S. Dist. Lexis 139613 at #5 (E.D.N.Y.

Dec 5, 2011) (Glasser, J);  New York Insurance Law § 5104(a).

Section 5102(d) of the New York Insurance Law defines a "serious injury" as an injury

which results in:

> Death; dismemberment; significant disfigurement; a fracture; loss
> of a fetus; permanent loss of use of a body organ, member,
> function or system; permanent consequential limitation of use of a
> body organ or member; significant limitation of use of a body
> function or system; or a medically determined injury or
> impairment of a nonpermanent nature which prevents the injured

> person from performing substantially all of the material acts which
> constitute such person's usual and customary daily activities for
> not less than ninety days during the one hundred eighty days
> immediately following the occurrence of the injury or impairment.

As correctly stated by the United States in its Post-Trial Memorandum, a major goal of the legislature in enacting the no-fault law was to "keep minor personal injury cases out of court." Licari v. Elliot, 57 N.Y.2d 230, 236, 455 N.Y.S.2d 570, 573, 441 N.E.2d NE2d 1088, 1091 (1982). The Second Circuit further delineated the purpose of the no-fault law, stating that, "[a] major objective of New York's no-fault insurance law is to eliminate most auto accident tort suits in order to reduce the burden on courts." Rosa v. Allstate Ins. Co., 981 F.2d 669, 676 n.15 (2d Cir. 1992).

With respect to the nine statutory categories in the no-fault law, there is no proof of any fracture or permanency. In fact, as the Court noted above, it was clear that plaintiff's counsel refrained from even asking Dr. Durant whether the plaintiff's knee condition was permanent. Therefore, the plaintiff is proceeding on the final category of the no-fault law, namely, "a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days following the occurrence of the injury or impairment." New York Ins. Law § 5102(d). In fact, that this standard is the one relied upon by the plaintiff is confirmed in the plaintiff's Post-Trial Memorandum at page 9.

After the accident of November 25, 2009, the plaintiff declined to enter an ambulance at the scene, but went to the Southside Hospital Emergency Room at approximately 7:35 pm. She complained of pain in her neck, back and right knee. In answer to a question by her counsel she

stated that she was "treated and released."  No mention was made as to what treatment she

referred to.  Following the visit to the hospital she was treated by two chiropractors for a "lot of

pain", clicking and buckling in her right knee.  She was then referred to Dr. Durant, the

orthopedic surgeon who performed a surgery referred to as "diagnostic arthroscopic" surgery.

After the surgery, the plaintiff saw Dr. Durant on one additional visit on January 25,

2010.  At that time, he referred the plaintiff for physical therapy.  The Court notes that after the

January 25, 2010 visit to Dr. Durant, the plaintiff  was never treated or examined by Dr. Durant

or any other physician for the injuries sustained in this accident.  The plaintiff was treated by her

chiropractor for seven to eight months.  In October 2010 she obtained employment by an

electronic manufacturer.  It was a job in which she could sit.  She was laid off in May 2011 and

has not worked since that time.  Her present complaints are that she cannot play or run with her

baby because her knee hurts a lot; she cannot wear high heels; she cannot walk or stand too long;

and she cannot go to the gym because the exercises involve running.  She also testified that she

cannot have a job where she has to stand and lift heavy items.

There has been substantial litigation interpreting this 90/180 day "serious injury" cause

of action.  In Thompson v. Abbasi, 15 A.D.3d 100, 101, 788 N.Y.S. 2d 49, 53 (1st Dep't 2005),

the Court interpreted the statutory words "substantially all" to mean "that the person has been

prevented from performing his [or her] usual activities to a great extent, rather than some slight

curtailment."  See also, Gaddy v. Eyler, 79 N.Y.2d 955, 958, 582 N.Y.S.2d  990, 992, 591

N.E.2d 1176, 1178 (1992); Licari v. Elliott, 57 N.Y.2d 230, 236, 455 N.Y.S. 2d 570, 441 N.E.2d

1088 (1992); Berk v. Lopez, 278 A.D.2d 156, 157, 718 N.Y.S. 2d 332, 333 (1st  Dep't 2000);

Brusso v. Imbeault, 699 F. Supp. 2d 567, 582 (W.D.N.Y. 2010).

Further, in this type of no fault "serious injury" case, the plaintiff must submit competent medical evidence to support her claim that she was unable to perform substantially all of her daily activities for not less than 90 of the 180 days immediately following the accident, as a result of the subject accident.  Kearse v. New York City Transit Auth., 16 A.D.3d 45, 52, 789 N.Y.S.2d 281, 287 (2d Dep't 2005); Sante-Aime v. Ho, 274 A.D.2d 569, 570, 712 N.Y.S. 2d 133, 136 (2d Dep't 2000 ); Jackson v. New York City Transit Auth., 273 A.D.2d 200, 201, 708 N.Y.S. 2d 469, 470 (2d Dep't 2000 ); see also, Knijnikov v. Mushtaq, 35 A.D.3d 545, 547-48, 827 N.Y.S.2d 198, 200 (2d Dept. 2006) ("the plaintiffs provided no competent medical evidence to show that any of the injured plaintiffs were unable to perform substantially all of his or her daily activities for not less than 90 of the first 180 days subsequent to the subject accident.")

The plaintiff's allegations that her injuries fell within the 90/180 day category must be substantiated by objective medical proof; self-serving statements are insufficient.  Brusso v. Imbeanlt, 699 F. Supp. 2d at 583; see also, Hyacinthe v. United States, No. 05-CV-1363,  2009 WL 4016518 (E.D.N.Y.  Nov. 19, 2009) ("objective medical findings" are required to prove 90/180 impairment); Gualtieri v. Farina, 283 F. Supp. 2d 917, 925 (S.D.N.Y. 2003) (holding that there can be no serious injury under the 90/180 category where the plaintiff's "self-serving testimony that she can no longer clean her house or hold her baby for long periods of time is unsubstantiated").  Here, the Court notes that there was no medical evidence that substantiated such a ninety day period.  The only medical expert produced by the plaintiff was not asked that material question.

The plaintiff has the burden to provide objective medical evidence to establish the extent or degree of her alleged physical limitation resulting from the injuries in the accident.  Ponce v.

Magliulo, 10 A.D.3d 644, 781 N.Y.S.2d 703, 704 (2d Dep't 2004); Davis v. New York City Transit Auth., 294 A.D.2d 531, 532, 742 N.Y.S.2d 658, 659 (2d Dep't 2002).  This she failed to do.  As stated above, no medical expert testified that she was unable to perform any of the material acts instituting her usual and customary daily activities for not less than 90 days.

Also, there was no medical evidence to explain the gap in medical treatment from the last visit to Dr. Durant on January 25, 2010 for at least the one year period up to the time of the trial. See Pommels v. Perez, 4 N.Y.3d 566, 574-75, 797 N.Y.S.2d 380, 384-85, 830 N.E.2d 278 (2005); Waring v. Guiruis, 39 A.D.3d 741, 742, 834 N.Y.S.2d 290, 291 (2d Dep't 2007); Cerviao v. Gladyzs-Steliga, 36 A.D.3d 744, 744-45, 829 N.Y.S.2d 169, 170-71 (2d Dep't 2007); Chan v. Casiano, 36 A.D.3d 580, 580-81, 828 N.Y.S.2d 173, 174 (2d Dep't 2007); Farozes v. Kamran, 22 A.D.3d 458, 459, 802 N.Y.S.2d 706, 707 (2d Dep't 2005).

There is substantial evidence that the plaintiff did not sustain a medically determined injury or impairment that prevented her from performing all her usual and customary daily activities for not less than ninety days.  Initially the Court again notes that no medical expert has said so.  Dr. Durant testified that after the surgeries, the plaintiff told him she was "fine" and "doing well."  The Court also notes that the plaintiff was not working at the time of the accident. The plaintiff told an employment agency that she had no working restrictions after the accident. (Tr. 88).  During her employment she worked full time between October 10, 2010 and May 11, 2011 and also worked overtime.  (Tr. 94).  No doctor placed any restrictions on her ability to work.  Also the Court notes that after being laid off in May 2011, she only searched for one job. (Tr. 92, 93).

Dr. Durant's testimony did not support the plaintiff's serious injury contention.

Remarkably, a close review of Dr. Durant's testimony reveals that he never directly testified that the plaintiff's right knee condition was caused by the trauma of the November 25, 2009 accident. Also, significantly, he testified that the small meniscus tear in the right knee could have been caused by trauma or wear and tear of the meniscus. (Tr. 23, 24). Of importance, Dr. Durant did not testify that the plaintiff was limited in any activity, in work or otherwise.

Of importance in this "serious injury" inquiry, a review of the plaintiff's testimony reveals that she did not testify that she was unable to perform any of her usual and customary activities within the "not less than ninety days during the one hundred eighty days following the occurrence." Nor, as stated above, did she present any medical evidence to that effect. In fact, Dr. Durant ceased treating her within sixty days and, apparently, he placed no restrictions on her activities. The plaintiff did testify that she cannot play with her children, go to the park and to the gym. Totally lacking however is any evidence either by the plaintiff or anyone else or any medical proof that established that any of her other usual and customary activities were curtailed during the relevant period. See, for example Brusso v. Impeault, supra at 583. ("Further, Brusso has offered no medical proof establishing that any of her usual and customary activities were significantly curtailed during 90 of the first 180 days following the accident.")

To the contrary, the evidence at the trial indicated that the plaintiff had little limitations following the accident. She complained of no pain in the visit of January 21, 2010; she apparently participated in all of her usual daily activities except that she could not play with her children; she had full flexion and full extension of her right knee on January 11, 2010. (Pltf's Ex. 2). The plaintiff did not return to Dr. Durant or any other doctor after January 25, 2010, four days after the surgery; sixty days after the accident, and almost two years before the trial. In

30

addition and crucial to such a determination, the plaintiff failed to present any medical evidence that she was restricted in her usual and customary activities during the time period referred to in the no-fault statute at issue.

It is interesting to note that in a recent case involving an injury to the plaintiff's right knee, summary judgment was granted to the defendant, on the issue of "serious injury" on somewhat similar grounds as the instant case.  In Diaz v. Chaudhry, 91 A.D.3d 590, 935 N.Y.S.2d 901, 902 (2d Dep't 2012), the decision, in part was based on the fact that "the plaintiff failed to adequately explain the cessation of his treatment after 2003."

The Court takes note that the no fault "serious injury" field has been markedly clarified in the recent case of  Perl v. Meher, 18 N.Y. 3d 208, 936 N.Y.S.2d 655, 960 NE2d 655 (Nov. 22, 2011).  In Perl it was ruled that there is no requirement that a plaintiff show contemporaneous range of motion testing following the accident and injury.  Also it was determined that where doctors disagree on issues of causation, such issues must be left for the jury to determine. However, in Perl, the plaintiff's expert apparently testified that the accident was a competent producing cause of the medical condition and of the restrictions in motion.  That evidence is lacking in this case.  Dr. Durant was never asked whether the motor vehicle accident at issue was a competent producing cause of the plaintiff's right knee condition.  The important issue of causation is lacking in this case.  The ruling in Perl would not salvage the no "serious injury" decision in this case.

Accordingly, the Court finds that the defendant proved that the November 25, 2009 motor vehicle accident, involving its postal truck, did not cause an injury that resulted in a 90 out-of 180 day curtailment of substantially all of the plaintiff's usual and customary daily activities.  The defendant has therefore proved, by a preponderance of the evidence, that the

31

plaintiff Dilcia Escoto did not sustain a "serious injury" within the provisions of the § 5102(d) of the New York Insurance Law.

### III.  Conclusions

Based on the reasons set forth in this opinion, the Court finds that the plaintiff  Dilcia Escoto has established, by a preponderance of the evidence, that the negligence of the defendant, the United States of America, by its authorized employee and driver, letter carrier Bonnie L. Gross, was the sole cause of the November 25, 2009 motor vehicle collision.

Notwithstanding this finding of liability on the part of the defendant, the Court also finds that the defendant has established, by a preponderance of the evidence, that the plaintiff Dilcia Escoto did not incur a "serious injury" under the provisions of the New York Insurance Law § 5102(d).

Accordingly, it is hereby ordered that judgment is rendered in behalf of the defendant United States of America dismissing the complaint.

It is further ordered that the Clerk of the Court close this case.

**SO ORDERED.**

Dated: Central Islip, New York
       March 13, 2012

_____/s/ Arthur D. Spatt_____
        ARTHUR D. SPATT
     United States District Judge

32